UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **CASHMAN EQUIPMENT CORP.** | **CIVIL ACTION** |
| **VERSUS** | |
| **ROZEL OPERATING CO., ET AL** | **NO. 08-363-C-M2** |

**RULING & ORDER**

This matter is before the Court on the Supplemental Memorandum in Support of the Motion to Compel (R. Doc. 53) filed by plaintiff, Cashman Equipment Corp. ("Cashman"). Cashman filed such memorandum in connection with its previously-filed motion to compel (R. Doc. 39) and in response to the supplemental privilege log (R. Doc. 52) submitted by defendant, Rozel Operating Co. ("Rozel"), in accordance with the Court's August 11, 2009 Ruling & Order (R. Doc. 49). Rozel has filed a response to Cashman's supplemental memorandum (R. Doc. 55).

**FACTUAL & PROCEDURAL BACKGROUND**

This lawsuit arises out of an incident involving a "breakwater" or "breaker" barge that was chartered by Rozel from Cashman in June 2007 to be submerged near a platform in shallow waters in the Gulf of Mexico to reduce wave action while work was being performed on the platform. In September 2007, after the barge was submerged and the platform work was completed, the barge was unable to be raised from the Gulf. Subsequently, the U.S. Coast Guard ("USCG") contacted Cashman and Rozel and demanded that the barge be removed from the bottom of the Gulf or risk $25,000.00 per day in penalties. Cashman

1

refused to remove the barge, contending that it was Rozel's responsibility under their charter agreement. Rozel made additional efforts to remove the barge in December 2008 and January 2009, without success. During those efforts, the barge broke apart and is essentially a total loss, currently remaining at the bottom of the Gulf.

Cashman subsequently filed this suit against Rozel, wherein it contends that, under the charter agreement between it and Rozel, Rozel was required to obtain two (2) specific marine insurances or coverages to insure the barge in question (*i.e.*, a Hull and Machinery insurance policy and a Protection and Indemnity ("P & I") policy). Cashman also contends that Rozel was required to make Cashman an additional insured on those policies, with a waiver of subrogation in Cashman's favor. While Cashman concedes that Rozel obtained a Hull insurance policy from Continental Insurance Company ("CNA"), which contains sufficient language to render Cashman an additional insured under that policy, it alleges that Rozel nevertheless failed to obtain the P & I policy. Rozel did, however, obtain a Commercial General Liability Policy ("CGL policy") that included a "Marine Endorsement" from St. Paul Travelers Insurance Company ("St. Paul"), but there is an unresolved issue as to whether Cashman is a named insured under that CGL policy.

Cashman's claims against Rozel are for unpaid charter hire and for the damages sustained by Cashman as a result of Rozel's failure to return the barge in question, including the repair or replacement cost of the barge, the costs and expenses to remove the barge from its current resting place, the loss of use of the barge, as well as other costs

and expenses incurred by Cashman, such as attorney's fees, as a result of Rozel's numerous alleged breaches of the charter agreement between Cashman and Rozel.[1]

Rozel contends that the barge in question was sunk in the intended location apparently without incident and that, at all times, it exercised due care in the handling of the barge. It further alleges that the barge was unable to be raised, following completion of the platform job in August 2007, because it had severe cracks as were revealed by a subsequent inspection (*i.e.*, the barge was "unseaworthy"). As mentioned above, after Rozel was unable to raise the barge in August 2007, it hired subcontractors and engaged in additional efforts to raise it in December 2008 and January 2009. Rozel claims that it spent $1.3 million attempting to raise the barge without success, and, through its counterclaim in this suit, it seeks to recoup those expenses from Cashman.

Cashman disputes that it is legally obligated to pay Rozel on its counterclaim and asserts, in its present supplemental memorandum, that one of its defenses to payment is the "propriety and reasonableness of the recovery methods employed [by Rozel and its subcontractors] and the costs for same." Cashman therefore asserts that communications by and between Rozel and the subcontractors it employed to assist with and supervise the operations to recover the barge in question are relevant and discoverable in this action. Cashman's other defense to Rozel's counterclaim relates to Rozel's failure to obtain P & I insurance. According to Cashman, Rozel was required by the charter party agreement

---

[1] Cashman has also asserted claims against CNA for insurance coverage under the Hull policy, payment of the agreed value of the barge in question, and for bad faith penalties relative to CNA's alleged improper handling, adjustment and denial of Cashman's claim. Cashman has similarly sued St. Paul for coverage under the CGL policy, payment of its damages, and for bad faith penalties relative to its alleged improper handling, adjustment and denial of Cashman's claim. Finally, Cashman has filed claims against Delta Towing and Larose Tugs for the negligence of their vessels and personnel to the extent that their negligence is a cause of damage to the barge in question and Cashman's alleged resulting losses.

to obtain P & I insurance in the amount of $1 million.  Cashman asserts that the failure to obtain P & I insurance is significant because that policy would have provided coverage for wreck removal, which Cashman contends arguably covers the expenses Rozel incurred in attempting to raise the barge.  Cashman therefore argues that the actions of Rozel and its insurance brokers concerning the location and placement of P & I coverage and the submission of claims related to the attempted raising of the barge are also "very relevant" to Cashman's defenses in this suit.

In the memorandum submitted with its supplemental privilege log and its subsequent response to Cashman's supplemental memorandum in support of its motion to compel, however, Rozel explains that it is a closely-held company consisting of only nine (9) employees that engages in the oil and gas exploration and production business.  It notes that it primarily employs geologists, geophysicists, and landmen and that it does not have the "in-house expertise" to evaluate the issues involved in this case, such as the seaworthiness of the barge in question, insurance coverage, etc.  Rozel therefore contends that, in anticipation of potential litigation as well as during this litigation, it has consulted with "outside attorneys, engineering consultants, insurers, and insurance agents in connection with the various issues raised by this lawsuit."  Rozel asserts that its communications with such "representatives" and "consultants" are subject to protection under the work product doctrine and have therefore been included in its supplemental privilege log.

In its supplemental memorandum in support of its motion to compel, however, Cashman contests the applicability of the work product doctrine to a number of those documents listed in Rozel's supplemental privilege log relating to Rozel's communications with its alleged "consultants" and contends that Rozel is withholding documents that contain

information that is both "relevant and important" to Cashman's defenses to Rozel's counterclaims.

## ANALYSIS

As a preliminary matter, the Court notes that, even if certain documents listed in Rozel's privilege log are "relevant and important" to Cashman's defense of Rozel's counterclaim, that fact alone is not sufficient grounds to deem the documents discoverable where Rozel has asserted a legitimate claim of privilege. In order to find the documents discoverable, the Court must find that the claim of privilege is not, in fact, legitimate and/or that Cashman has such a substantial need for the privileged documents to prepare its case and cannot obtain the information contained therein or the substantial equivalent by any other means without undue hardship, such that the privilege should be disregarded. Fed. R. Civ. P. 26(b)(3)(A)(ii). Additionally, the contention that Rozel may have "interfered" with Cashman's ability to obtain documents from certain third parties via subpoena is irrelevant to the present motion to compel, and, to the extent Cashman had issues in that regard that could not be resolved without court intervention,[2] it should have sought that intervention through a separate motion(s).[3]

---

[2] Specifically, Cashman contends that Rozel frustrated its efforts to obtain documents via subpoena from several of the subcontractors who assisted with the attempts to raise the barge by "interposing" itself in the subpoena process, taking possession of the responsive documents and determining which documents would be produced to Cashman, and requiring Cashman's counsel to travel to the office of Rozel's counsel in Lafayette to physically review the additional documents withheld by Rozel.

[3] The Court notes, however, that, based upon the exhibits submitted with Rozel's response, which include various letters and emails among counsel for the parties arranging for Cashman's counsel to obtain the subpoenaed documents after inspection and copying at the office of Rozel's counsel, it does not appear that Cashman's counsel had any objection to the alleged "interjection" of Rozel's counsel in the process of producing the subpoenaed documents and that the parties were actually quite cooperative with

The primary issue that the Court must address relative to Cashman's present supplemental memorandum is whether Rozel has a legitimate claim of privilege in relation to communications by and for certain alleged "consultants" and "agents" that have been withheld and listed in Rozel's supplemental privilege log. Those alleged "consultants" and "agents" include Stokes & Spiehler ("Stokes"), a turnkey oil and gas engineering firm that Rozel contends served as its engineering consultant and project manager on the subject platform job and as its consultant and agent in dealing with the USCG in connection with the USCG's demand that the barge be raised and removed from the bottom of the Gulf; and Regions Insurance ("Regions") and J.H. Blades ("Blades"), two insurance brokers with which Rozel dealt in connection with the incident that is the subject of this lawsuit. In its supplemental memorandum, Cashman contends that the above-referenced, alleged "consultants" and "agents" are actually "fact witnesses who were directly involved with the factual occurrences giving rise to both Cashman's and Rozel's claims against one another"[4] and that Rozel has failed to prove that they are the types of "outside consultants" whose communications are protected under the work product doctrine, as contemplated by the jurisprudence.

As to Cashman's argument that it is entitled to the documents by and for Stokes, Regions, and Blades because they are "fact witnesses who were directly involved with the factual occurrences giving rise" to the claims in this litigation, such argument is not a basis

---

one another in arranging and carrying out that process. After considering that correspondence and the response of Rozel to Cashman's present supplemental memorandum, it does appear unusual that Cashman now claims that Rozel's counsel acted in bad faith and "interfered" with discovery efforts relative to those third party subpoenas.

[4] Cashman explains that Stokes, Regions and Blades are and were "intimately involved with this litigation and could potentially be named as parties, based upon their respective acts and omissions."

for disregarding Rozel's claims of privilege and requiring disclosure of the documents listed in its supplemental privilege log.  Rozel has expressly indicated in its response to Cashman's supplemental memorandum in support of its motion to compel that it has already produced those documents by and for Stokes, Regions and Blades that relate to the facts underlying this litigation and is only withholding those documents that relate to communications with those entities in anticipation of and during this litigation.  Thus, it appears that Cashman has obtained that fact information through documents already produced.  Additionally, it can ascertain such factual information through other means, such as when the depositions of those entities are taken in connection with this matter.

Furthermore, although Cashman relies upon one district court case out of the Middle District of Florida, *Bray & Gillespie Management, LLC v. Lexington Ins. Co.,* 2008 WL 4791308 (M.D. Fla. 2008), for the assertion that Rozel must come forward with independent evidence indicating that Stokes, Regions, and Blades are "consultants" for purposes of this litigation, such case is not binding in this district, and the Court finds that such independent proof is not necessary since a review of the withheld documents themselves will reveal whether or not Stokes, Regions, and Blades were and/or are indeed acting as "consultants" for this litigation in relation to those documents or whether such documents were prepared or received by them in their ordinary course of business as subcontractor or broker for Rozel.  Accordingly, instead of requiring Rozel to come forward with independent evidence of consultant status, such as retention agreements an invoices,[5]

---

[5] As an aside, the Court notes that, if Stokes, Blades, and Regions are indeed "consultants" as Rozel contends and it does not have a written retention agreement and/or invoices indicating payments it has made to such entities in their capacity as "consultants," Rozel may ultimately have difficulty proving the amounts it has paid those entities as consultants in connection with this litigation when seeking to recover those amounts from Cashman if successful on its counterclaim.

the Court will require that Rozel produce the first thirty (30) documents listed in its supplemental privilege log involving each of those entities (*i.e.*, a total of ninety (90) documents) for the Court's *in camera* review to determine whether those entities are indeed "consultants" for purposes of this litigation such that communications by and for them are subject to protection under the work product doctrine.[6]

Accordingly;

**IT IS ORDERED** that defendant, Rozel Operating Co., shall produce, within ten (10) days of this Order, the first thirty (30) documents involving Stokes & Spiehler, Regions Insurance, and J.H. Blades (*i.e.*, a total of ninety (90) documents) listed in its supplemental privilege log (R. Doc. 52), in the order listed, for the Court's *in camera* review to determine whether those entities should be considered "consultants" for purposes of this litigation and whether communications by and for them that are listed in the supplemental privilege log should be protected under the work product doctrine.  <u>These copies shall be brought directly to Chambers without being electronically filed into the record.</u>

Signed in chambers in Baton Rouge, Louisiana, October 6, 2009.

**MAGISTRATE JUDGE CHRISTINE NOLAND**

---

[6] It is important that the documents produced be the *first* thirty (30) documents involving Stokes, Blades, and Regions listed in the supplemental privilege log so that Rozel does not have the opportunity to "pick and choose" among the documents and select only those which involve legal issues/advice relating to this litigation.