UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

**CASHMAN EQUIPMENT CORP.**                                   **CIVIL ACTION**

**VERSUS**                                                    **NO: 08-0363-MVL-SS**

**ROZEL OPERATING CO., et al**

## REPORT AND RECOMMENDATION

The motion of the plaintiff, Cashman Equipment Corp. ("Cashman"), for attorneys' fees and costs (Rec. doc. 362) was referred to the assigned Magistrate Judge. Rec. doc. 363. For the reasons provided below, it is recommended that Cashman's motion be granted in part and the defendant, Rozel Operating Co. ("Rozel"), be required to pay attorneys' fees of $129,669.62 and costs of $15,471.12 for a total of $145,140.74.

## Background

On June 18, 2008, Cashman filed a complaint against Rozel and others. Rec. doc. 1. The claim arose out of Rozel's bareboat charter of two of Cashman's barges, the JMC 107 and JMC 109, to act as breaker barges to assist in drilling an offshore well. Rec. doc. 253 at 6. Part 15 of the charter for the JMC 109 provides:

> Payment of legal fees: The Charterer [Rozel] further agrees that in the event of any legal action . . . arising out of or as a result of Charterer's breach or default of any of the provisions and covenants of this charter, that said Charterter shall pay <u>reasonable</u> attorney's fees incurred by Owner and all costs involved therein.

Rec. doc. 226 (Exhibit 1 at 3) (emphasis added).

On December 11, 2012, there was a jury verdict in favor Cashman and against Rozel and another defendant, Stokes and Spiehler Offshore, Inc. ("Stokes"). Rec. doc. 355 (Attachment 6).

A judgment was entered. It provides, in part, that:

> Cashman Equipment Corporation is awarded the <u>reasonable</u> attorneys fees and costs incurred in its prosecution of its claims against Rozel Operating Company, Inc. <u>on which it was successful</u>, all in accordance with the terms of the charter party for the JMC 109.

Rec. doc. 361 (emphasis added). Cashman filed for an award of attorneys' fees of $518,678.50 and costs of $61,884.50. Rec. doc. 362. Rozel contends that the attorneys' fees should be limited to $10,000.00 and the claim for costs be denied. Rec. doc. 366 at 13 and 15.

### **Arguments of the Parties**

Cashman contends that the attorneys' fees and costs related to the claims on which it was successful necessarily include the fees and costs incurred: (1) in defeating Rozel's attempts to void the charter agreement; and (2) in pursuit of claims against other parties because Rozel sought to shift responsibility to these parties. It argues that all of the discovery in the case is related to the claims on which it was successful.

Rozel responds that the critical factor in evaluating Cashman's fee request is the lack of success it achieved. It argues that the fees should be reduced because: (1) some of the parties sued by Cashman were dismissed; (2) Cashman settled with one defendant, Continental Insurance Company ("Continental" or "CNA"), on the eve of trial; (3) its claims pertaining to JMC 107 were dismissed; (4) it did not prevail on all of its contractual claims against Rozel; and (5) some of Rozel's claims against Cashman were extra-contractual. Rozel reports that before the trial Cashman rejected offers to settle. It argues that the result obtained by Cashman by trying the case certainly does not justify an award for fees and costs incurred after the rejection of settlement offers.

Cashman replies that: (1) Rozel ignores some of the relief obtained in the judgment; (2) the defeat of Rozel's claims was a prerequisite to its success on its claims against Rozel; and (3) the

settlement proposals were contingent.

Cashman submitted a 160 page accounting description of the fees and costs incurred by it. The document indicates the date of each entry, the timekeeper, the hourly rate, the time associated with the entry, a description of the activity, and its value (hours times rate). Where there is an expense, there is a description of the expense and the amount of the expense. Rec. doc. 362 (Exhibit). Rozel does not take issue with the proposed hourly rates or the amount of time spent on the tasks described in the accounting. It does raise an issue about block billing. Rec. doc. 366 at 10.

## Law Applicable

The method by which the district court calculates an attorneys' fees award is well established. The district court first calculates the "lodestar." Forbush v. J.C. Penney Co., 98 F.3d 817, 821 (5th Cir. 1996). The lodestar is the product of the number of hours reasonably expended on the litigation multiplied by a reasonable hourly billing rate. Hensley v. Eckerhart, 461 U.S. 424, 103 S. Ct. 1933, 1939-40 (1983).

The district court must eliminate excessive or duplicative time. Watkins v. Fordice, 7 F.3d 453, 457 (5th Cir. 1993). Next, the court must value the service according to the customary fee and quality of the legal work. The relevant market for purposes of determining the prevailing hourly billing rate to be paid in a fee award is the community in which the district court sits. Scham v. District Courts Trying Criminal Cases, 148 F.3d 554, 558 (5th Cir. 1998).

The district court may adjust the lodestar upward or downward depending on the respective weights of the twelve factors set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974). The factors are: (1) the time and labor required; (2) the novelty and

difficulty of the question; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d at 717-19. While the court is required to give reasons upon which an award is based, it is not required to fully address each of the Johnson factors in the recitation of its reasons. Curtis v. Bill Hanna Ford, Inc., 822 F.2d 549, 552 (5th Cir. 1987). Many of the Johnson factors are "subsumed" in the initial calculation of reasonable hours and rates. Hensley, 103 S. Ct. at 1940, n. 9. The Johnson factors can be considered in arriving at the lodestar as well as in determining whether to modify it. Cobb v. Miller, 818 F.2d 1227, 1232 n. 8(5th Cir. 1987).

Rozel emphasizes the eighth Johnson factor - the amount involved and the results obtained. In Hensley, the Supreme Court, in the context of civil rights litigation, stated:

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.
>
> If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. . . . [T]he most critical factor is the degree of success obtained.

\* \* \*

> There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment. This discretion, however, must be exercised in light of the considerations we have identified.

103 S. Ct. at 1940-41 (emphasis added and citations and footnotes omitted). See also, Farrar v. Hobby, 506 U.S. 103, 113 S. Ct. 566, 574 (1992).

## Analysis-Attorneys' Fees

**A.    Billing Judgment**.

In Green v. Administrators of Tulane Educational Fund, 284 F.3d 642 (5th Cir. 2002), the Fifth Circuit stated:

> To determine the number of hours reasonably expended on a case, a plaintiff must show that billing judgment was exercised. *Walker v. HUD,* 99 F.3d 761, 769 (5th Cir.1996). Billing judgment is usually shown by the attorney writing off unproductive, excessive, or redundant hours. *Id.* We have held that the remedy for failing to exercise billing judgment is to reduce the hours awarded by a percentage. *Id.* at 770.

284 F.3d at 662. In Walker, a 15% reduction was determined to be the appropriate reduction. 99 F.3d at 770. Cashman has not submitted its original time records. It has not produced any evidence of billing judgment. The attorneys' fees sought by Cashman will be reduced by 15% for failure to present any evidence of billing judgment.

**B.    Successful and Unsuccessful Claims**.

The law as well as the judgment (Rec. doc. 361) compel consideration of the degree to which Cashman was successful on its claims. The fees to be awarded are limited to those incurred in the prosecution of the claims against Rozell on which Cashman was successful. The award of fees is to be in accord with the terms of the charter party for the JMC 109. Rec. doc. 361.

5

Pursuant to part 15 of the charter agreement, the obligation to pay fees follows from legal action arising out of Rozel's breach or default of any of the provisions in the charter agreement. Rec. doc. 226 (Exhibit 1 at 3).[1]

As between Cashman on the one hand and Rozel and Stokes on the other, there was judgment:

1. In favor of Cashman and against Rozel on its claims of fraud and related claims.

2. In favor of Rozel and against Cashman on its claim that Rozel breached the charter agreement by failing to obtain P&I insurance and in failing to pay charter hire.

3. In favor of Cashman and against Rozel for failing to return the barge in the same good and seaworthy condition as when received.

4. That the reasonable value of the JMC 109 was $200,000.00.[2]

5. That Cashman was awarded $200,000 in damages with 40% attributable to Rozel for breach of the charter agreement and 60% to Stokes for its negligence.

6. In favor of Rozel and against Cashman dismissing its claims of negligent entrustment of JMC 109 to Stokes.

7. That Rozel and Stokes are obligated to retrieve the JMC from its current position on the bottom of the Gulf of Mexico with the retrieval costs allocated 40% to Rozel and 60% to Stokes.

Rec. doc. 361.

Cashman argues that fees related to the claims on which it was successful necessarily include

---

[1] Rozel agreed to redeliver the JMC 109 to Cashman in the same good and seaworthy condition as when it was received, ordinary wear and tear excepted. Id. at 2. In the event of damage greater than wear and tear, it was Rozel's duty to: (1) repair the barge; and (2) pay charter hire until it was repaired. The cost of the repairs could not exceed $2 million, the agreed value of the barge. Id. Rozel was required to procure insurance. Id. at 2-3.

[2] Not $2 million as claimed by Cashman.

those incurred in defeating Rozel's attempts to void the charter party. Rozel responds that because its fraud-based claims were not merely aimed at voiding the charter but also independent bases of recovery, Cashman should not be awarded fees for all of its effort in responding to the fraud claims.

Rozel's effort to exclude some of Cashman's efforts in responding to Rozel fraud's claims is without merit. This is demonstrated by reference to the jury verdict form (Rec. doc. 355). The first question asked of the jury was whether Cashman committed fraud or fraudulently induced Rozel to enter the charter agreement for the JMC 109. If the answer was "yes," the jury was required to answer question nos. 2 and 3 concerning damages to Rozel from the fraud, skip question nos. 4-6 concerning whether Rozel breached the charter agreement, and answer question no. 7 concerning Stansbury's alleged fraud. If the jury found that Cashman committed fraud or fraudulently induced Rozel to enter into the charter agreement, the jury did not consider whether Rozel breached the contract. The fees reasonably incurred by Cashman in response to Rozel's fraud claims were incurred in its prosecution of claims against Rozell on which it was successful.

Cashman was unsuccessful on the claims that Rozel breached the charter agreement by failing to obtain P&I insurance and pay charter hire. It was unsuccessful on its claim that the reasonable value of the JMC 109 was $2 million but instead the jury found that the reasonable value of the JMC 109 was only 10% of the amount claimed by Cashman. It is not entitled to fees for its pursuit of these claims.

On July 1, 2010, about three years after the filing of its original complaint, Cashman filed an amended complaint to clarify its claims against Rozel, to add a claim of negligent entrustment against Rozel, add Stokes as a defendant, and assert a claim of negligence against Stokes. Rec. doc. 111. Cashman alleged that Rozel committed the tort of negligent entrustment by tendering the barges to

Stokes and by failing to investigate, analyze or otherwise determine Stokes' skill, expertise, qualifications, capacity and/or ability to properly operate or utilize the barges. Id. at 4. Cashman did not prevail on the claim of negligent entrustment. It is not entitled to fees for its pursuit of this claim against Rozel.

Cashman alleged that Stokes was negligent in a number of respects; for example the failure to prevent the barges from sinking a reasonable distance into the seabed. Id. at 5. Cashman was awarded $200,000 in damages with 60% attributable to Stokes for its negligence. Whether or not Rozel sought to shift responsibility for its breach of the charter agreement to Stokes, a recovery against Stokes does not qualify for an award of attorneys' fees against Rozel.

Cashman was successful against Rozel for: (1) failure to return the barge in the same good and seaworthy condition as when received; (2) 40% of the $200,000 in damages ($80,000); and (3) the retrieval of the JMC 109 from the floor of the Gulf with 40% of the retrieval cost to be borne by Rozel. The fees reasonably incurred by Cashman in achieving these results were incurred in its prosecution of claims against Rozell on which it was successful. Cashman contends that Rozel's arguments do not take into account that the judgment requires it to retrieve the barge from the Gulf.

Cashman's original complaint included claims against Delta Towing, LLC ("Delta"), the Delta Goose *in rem,* LaRose Tugs, LLC ("LaRose") and the Tampa Bay *in rem*. These defendants moved for summary judgment. Rec. doc. 56 and 61. It was recommended that the motions be denied without prejudice with leave to re-file after further discovery. Rec. doc. 85. Two months later Cashman moved to dismiss the claims against those defendants, rec. docs. 95 and 96, and the motions were granted. Rec. docs. 98 and 99. There is no basis for Cashman to recover fees directly attributable to the claims against those defendants. For example, it cannot be awarded fees for the

preparation of the oppositions to the motions for summary judgment (Rec. doc. 69 and 70) and the motions to dismiss (Rec. docs. 95 and 96). The more difficult question is whether discovery related to these claims was also related to discovery required for the claims against Rozel, including overcoming Rozel's defense of fraud and fraud in the inducement.[3]

In its original complaint, Cashman named St. Paul Travelers Insurance Co. ("St. Paul) and alleged that it issued a policy of insurance to Rozel which named Cashman as an additional insured. Rec. doc. 1. St. Pau's motion to dismiss was granted as unopposed. Rec. doc. 16. Cashman's motion for a new trial was denied. Rec. doc. 82. Cashman made two unsuccessful attempts to re-join St. Paul as a defendant. Rec. docs. 83 and 161. Cashman was not successful in the pursuit of its claims against St. Paul.

The charter agreement provides that Rozel was required to procure Hull & Machinery insurance. Rec. doc. 226 (Exhibit 1 at 3). Cashman alleged that Continental issued a marine policy of Hull & Marine insurance to Rozel with Cashman named as an additional insured and loss payee. Cashman sought a judgment against Continental and the other defendants *in solido*. Rec. doc. 1. Rozel also asserted claims against Continental. Rec. doc. 27. In November 2012, Continental reported that there was a settlement of all of the claims against it. Pursuant to the settlement, it deposited $1.5 million into the registry of the Court pending resolution of the remaining claims among the parties. Rec. docs. 324 and 325. Rozel and Cashman dismissed their claims against Continental. Rec. docs. 339 and 340. No funds have been distributed from the registry of the Court.[4]

---

[3] Rozel has not identified the discovery that was not related to the claims on which Cashman was successful.

[4] How those funds will be distributed is unclear, but the jury's verdict regarding the value of the JMC109 may imply that the money will go toward Rozel's costs of salvaging the barge.

The Continental policy was obtained in fulfillment of the terms of the charter agreement and therefore Cashman's claim against Continental arises out of the charter agreement. The $1.5 million settlement was a substantial result, but obtained by the efforts of both Cashman and Rozel. Some of the fees related to Cashman's claims against Continental are recoverable.

**C.     Fees Incurred After Settlement Offers**.

Rozel contends that in May 2012, it made an offer to Cashman on the following terms: (1) payment of $250,000; (2) assumption of all liability for the retrieval of the JMC 109; and (3) a release of all of Rozel's claims for damages against Cashman. It contends that a month later it doubled the cash portion to $500,000. Cashman rejected these offers and submitted a counteroffer which included a payment from Rozel to Cashman of $1.5 million and the release of the $1.5 million in Continental funds to Cashman. Rozel urges that the jury verdict resulted in less than what Cashman would have received in the May 2012 settlement offer. It contends that 22.5% of the fees and costs sought by Cashman were incurred after the June 2012 settlement offer.

Cashman responds that the settlement proposals were contingent on the parties concluding a settlement with Continental. Pursuant to the settlement proposal, Cashman was required to proceed with the efforts to negotiate a settlement with Continental which did not occur until November 2012 or more than five months after the May 2012 settlement offer. Cashman contends that it negotiated a more favorable settlement with Continental than was contemplated by the May 2012 settlement offer.

Cashman does not dispute Rozel's statement of the amount Cashman sought in settlement of its claim against Rozel for damages ($1.5 million). The jury awarded only $200,000. The settlement negotiations demonstrate Cashman's lack of success on its claim for damages from Rozel.

**D.      Identification of Excluded Entries**.

The 160 pages of the accounting describing Cashman's entries for attorneys fees were reviewed. Some of the entries can be identified as unrelated to claims on which Cashman was successful. Cashman was not successful on its claims for the JMC 107. It was inspected on August 6, 2008. The following entries are exclusively related to the inspection of the JMC 107.

|          |            |
|----------|------------|
| 07/25/08 | 2.50 hours |
| 07/26/08 | 0.20 hours |
| 07/27/08 | 0.20 hours |
| 07/28/08 | 0.50 hours |
| 07/29/08 | 2.10 hours |
| 08/03/08 | 0.20 hours |
| 08/04/08 | 1.00 hours |
| 08/05/08 | 0.50 hours |
| 08/07/08 | 0.25 hours |
| 08/18/08 | 0.25 hours |
| Total    | 7.70 hours |

The entry for the actual inspection on August 6, 2008 is for 8.50 hours, but the record refers to work on other claims as well as the inspection. Cashman was not successful on its claims against Delta and LaRose. The following entries are exclusively related to the claims against Delta and LaRose.

|          |            |
|----------|------------|
| 10/02/09 | 0.25 hours |
| 10/19/09 | 0.40 hours |
| 07/04/10 | 2.70 hours |
| 07/05/10 | 0.60 hours |
| 07/06/10 | 1.00 hours |
| 06/17/11 | 0.70 hours |
| 06/20/11 | 0.50 hours |
| 06/20/11 | 0.30 hours |
| 06/21/11 | 0.20 hours |
| 06/22/11 | 1.50 hours |
| 07/08/11 | 0.20 hours |
| Total    | 8.35 hours |

Out of more than 2,450 hours, the review of the accounting revealed only 16 hours that were

11

exclusively related to claims on which Cashman was not successful.

**E.     Reasonable Fees**.

The evaluation on the claims on which Cashman was unsuccessful and the degree of success achieved on the remaining claims demonstrates that Cashman achieved only partial and limited success. In those circumstances, the lodestar may produce an excessive amount. Even after the 15% reduction for the absence of any evidence of billing judgment, the lodestar is excessive.[5] Hensley instructs that the district court may attempt to identify specific hours that should be eliminated. 103 S. Ct. at 1941. The Court's attempt to do this identified only 16 hours that should be eliminated without further inquiry, so that review is not dispositive.

If Cashman had not engaged in block billing, additional time may have been identified for elimination. Even if Cashman had not employed block billing, it would not have been possible to identify all time for claims on which it was not successful. For example, an entry for preparation of for a particular deposition would not have indicated whether all of the examination in that deposition was relevant to claims on which Cashman was successful.

In these circumstances, a district court may simply reduce the award to account for the limited success. 103 S. Ct. at 1941. While the court has discretion in making this equitable judgment, Hensley instructs that it must be exercised in light of the considerations it identified. Id.

Considering the limited success obtained, the undersigned finds that a fee of 25% of the total fees incurred is reasonable. The Court therefore finds that the lodestar should be reduced to $129,669.62.

---

[5] Cashman seeks fees of $518,678.50. With a 15% reduction, the lodestar is $440,876.50.

**F.      Other Johnson Factors**.

The analysis thus far has focused on the eighth Johnson factor. The first factor is the time and labor required. This is already included in the lodestar. "[T]he district court must be careful ... not to double count a Johnson factor already considered in calculating the lodestar...." Walker, 99 F.3d at 771. The second factor is the novelty and difficulty of the question. The Supreme Court greatly limited the use of this factor. Id. It is not an issue in Cashman's claim for attorneys' fees. The third factor is the skill required to perform the legal services properly. The Supreme Court also limited the use of this factor. Id. This issue is subsumed in the lodestar determination of the hours reasonably expended. The fourth factor is the preclusion of other employment by the attorney due to this case. These concerns, particularly the time demands, are ordinarily subsumed in the lodestar. Shipes v. Trinity Industries, 987 F.2d 311, 321-22 (5th Cir. 1993). The fifth factor is the customary fee. This factor is taken into account in setting the hourly rates for the lodestar determination and is not in dispute. The sixth factor is whether the fee is fixed or contingent. The seventh factor concerns the time limitations imposed by the client or the circumstances. The sixth and seventh factors are not relevant to Cashman's claim. The ninth factor is the experience, reputation and ability of counsel. The Supreme Court limited the use of this factor. Walker, 99 F3d at 771. The tenth factor is the undesirability of the case. There is no evidence to support an adjustment for this factor. The eleventh factor is the nature and length of the professional relationship with the client. Cashman has not urged that this factor has any relevance. The twelfth factor requires the Court to consider awards in similar cases. The parties did not present any reports of fees in similar cases.

**Analysis - Costs**

Pursuant to Fed. R. Civ. P. 54(d)(1), costs, other than attorneys' fees, should be allowed to the prevailing party. 28 U.S.C. § 1920 make provision for the taxation of costs. Rozel contends that Cashman is not entitled to any costs. In the alternative, it urges that the costs be limited to a small fraction of the amount recoverable under Section 1920.

Rozel cites Champion Produce, Inc. v. Ruby Robinson Co., Inc., 342 F.3d 1016 (9th Cir. 2013), where the prevailing party in a contract action was denied costs when the jury returned a verdict for less than a third of the amount sought by the plaintiff. The contract at issue in Champion Produce did not include a provision for attorneys' fees and costs. Before the entry of judgment, the defendant made a Rule 68 offer of judgment. The plaintiff rejected the offer, but the jury verdict was for less than the amount sought in the complaint. The plaintiff was denied pre-offer costs. Champion Produce is not applicable to Rozel's argument under Rule 54(d)(1) and Section 1920.

Cashman responds that the scope of the costs to be awarded is determined by the terms of the charter agreement and not by Rule 54(d)(1) and Section 1920. The charter agreement provides that Rozel "shall pay reasonable attorney's fees incurred by OWNER and all costs involved therein." Rec. doc. 226 (Exhibit 1 at 3) (emphasis added).

In Crawford Fitting Co. v. J. T. Gibbons, Inc., 482 U.S. 437, 107 S.Ct. 2494, 2497 (1987), the plaintiff prevailed on an antitrust violation. The plaintiff filed a bill of costs which included substantial expert witness fees. At the time of the decision, 28 U.S.C. §1821 provided a witness fee of $30 per day for each day's attendance. The issue was whether the losing party could be required to pay the compensation of the winner's expert witnesses. The Supreme Court held that:

> [W]hen a prevailing party seeks reimbursement for fees paid to its own expert witnesses, a federal court is bound by the limit of § 1821(b), absent contract or

explicit statutory authority to the contrary.

Id. at 439 (emphasis added). Because of the charter agreement's provision requiring payment of "all costs involved therein," Cashman is not limited to the costs permitted under Section 1920.

Billing judgment is not an issue with costs. Like the issue with attorneys' fees, the issue with costs is the degree of success obtained by Chapman.[6] As with the attorneys' fees, the costs will be reduced to account for Cashman's limited success. In light of the considerations identified in Hensley, and applying the 25% factor the undersigned applied to the fees, the costs will be reduced from $61,884.50 to $15,471.12.

## Recommendation

IT IS RECOMMENDED that: (1) Cashman's motion for attorney's fees and costs (Rec. doc. 362) be GRANTED in PART and DENIED in PART; and (2) Rozel be required to pay attorneys' fees of $129,669.62 and costs of $15,471.12 for a total of $145,140.74.

---

[6] By way of example, the expenses for the first two months of the litigation include:

| Date | Amount | Description |
|---|---|---|
| 06/18/08 | 50.00 | Service on Continental and St. Paul-Travelers. |
| 06/18/08 | 81.00 | Mileage to Baton Rouge. |
| 06/18/08 | 350.00 | Filing fee. |
| 06/30/08 | 11.32 | Certified mail to Delta. |
| 06/30/08 | 11.32 | Certified mail to LaRose. |
| 06/30/08 | 96.50 | Photocopies. |
| 07/07/08 | 19.65 | Fedex to Blair Michael. |
| 07/07/08 | 85.00 | Service of summons. |

The charges for the service of Travelers and the certified mail to Delta and LaRose can be identified as charges related to claims on which Chapman was not successful. Other charges, for example, the filing fee for the complaint, cannot be identified as charges related to a particular claim.

**Objections**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. USAA, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 17th day of April, 2013.

_____
**SALLY SHUSHAN**
**United States Magistrate Judge**